IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| CAROLINA TOBACCO COMPANY, | ) | Appeal No. 06-1170-KI |
| | ) | *(Bankruptcy Case No.: 05-34156-elp11)* |
| Debtor, | ) | |
| | ) | Chapter 11 |
| Settling States,[1] | ) | |
| | ) | |
| Appellant and Cross-Appellee, | ) | OPINION AND ORDER |
| | ) | |
| vs. | ) | |
| | ) | |
| Carolina Tobacco Company, | ) | |
| | ) | |
| Appellee and Cross-Appellant. | ) | |

---

[1] The "Settling States" refers to those states that entered into the tobacco Master Settlement Agreement in 1998.  The term includes all of the United States except for Florida, Minnesota, Mississippi, and Texas (which settled their litigation with the tobacco industry separately), and six other jurisdictions - American Samoa, the District of Columbia, Guam, the Northern Mariana Islands, Puerto Rico, and the Virgin Islands.  While Carolina is not currently selling its cigarettes in all of the Settling States, certain of the terms of its plan as originally proposed (and as requested in its cross-appeal) would affect all of those states and they have, accordingly, all joined the appeal.

Page 1 - OPINION AND ORDER

Tara J. Schleicher
Peter C. McKittrick
Farleigh Witt
121 SW Morrison, Suite 600
Portland, Oregon  97204

      Attorneys for Carolina Tobacco Company

Samuel R. Maizel
Pamela E. Singer
Pachulski Stang Ziehl Young Jones
      & Weintraub LLP
150 California Street, 15th Floor
San Francisco, California  94111-4500

Karen Cordry
National Association of Attorneys General
750 First Street, NE, Suite 1100
Washington, D.C.  20002

      Attorneys for Settling States

KING, Judge:

      Thirty-four states and the District of Columbia (the "States") have filed a Statement of Election under 28 U.S.C. § 158(c) to have their appeal of the bankruptcy court's <u>Order Confirming Third Amended Plan of Reorganization Dated October 18, 2005  (As Modified February 24, 2006)</u> heard by the District of Oregon.  The debtor has filed a cross-appeal.

## BACKGROUND

      In an effort to resolve lawsuits filed by 46 states, the District of Columbia and the territories (the "Settling States") against major tobacco companies, the Settling States and tobacco companies entered into a settlement ("Master Settlement Agreement") whereby the tobacco companies were required to make yearly payments to the Settling States in return for the

Page 2 - OPINION AND ORDER

Settling States' dismissal of the lawsuits each had filed. Tobacco product manufacturers ("TPMs") that did not participate in the settlement are called non-participating manufacturers ("NPMs"). Part of the Master Settlement Agreement required the Settling States to adopt legislation directing NPMs to deposit annual or quarterly payments into an interest-bearing qualified escrow account ("Escrow Deposit Statutes"). If an NPM does not pay the escrow deposits, a state may remove the NPM from the directories of manufacturers allowed to sell in the state – this is called delisting.

The escrow deposits are to be used to pay any judgments that the Settling States obtain against the NPMs. If after 25 years no judgment has been rendered, the money is returned to the NPMs. The funds are held in an account in the NPM's name. The NPM may use the interest earned on the escrow deposit. The NPM is not to use the escrow deposit as collateral for loans.

Pursuant to the Settling States' interpretation of their statutes, in order to be an NPM, and be listed in the directories of manufacturers, the company must be the actual maker of the cigarettes, with a "bricks and mortar" facility and employees on its payroll. When Carolina first started producing cigarettes it contracted with a subsidiary of a Latvian company, House of Prince-Riga (collectively, "House of Prince"), to manufacture its cigarettes. House of Prince was subject to the Master Settlement Agreement. The contract between Carolina and House of Prince provided that Carolina would be liable for all amounts owed under the Escrow Deposit Statutes, and that it would hold harmless House of Prince for any liabilities to the Settling States House of Prince might face.

Many of the Settling States began asserting that House of Prince was the true manufacturer of the Carolina cigarettes and, as a result, Carolina could not be listed in the

directories of manufacturers and could not sell cigarettes in the affected states.  Furthermore, the Settling States asserted that House of Prince was responsible for payment obligations in the Master Settlement Agreement for the cigarettes House of Prince manufactured for Carolina.

House of Prince turned to Carolina demanding assurances that cigarette sales be in conformance either with the Master Settlement Agreement or with the Escrow Deposit Statutes, and that Carolina defend House of Prince.  In order to quell the concerns of House of Prince, Carolina entered into a Collateral Security and Assignment Agreement dated March 15, 2002 and a Joint Defense Agreement ("Security Agreement").  Under the Security Agreement, Carolina gave House of Prince a security interest in its residual interest in the Escrow Account (its possible right to receive the deposits back after 25 years if the Settling States failed to object to such a release) to protect House of Prince's rights of indemnity if it were held liable for a judgment or settlement arising from its manufacturing operations for Carolina.  The Security Agreement specifically provided that all claims of House of Prince to the funds are subordinate to the rights of the States.

In February 2003, California filed an Application for Enforcement of Master Settlement Agreement against House of Prince, contending that House of Prince was obligated to make payments for the sales of cigarettes manufactured on behalf of Carolina ("California Litigation").  Other states asserted the same claims against House of Prince.  The aggregate amount of those claims pertaining to Carolina's cigarettes is approximately $105 million.

House of Prince subsequently terminated its agreement with Carolina in mid-2003.  In May 2003, as the States and House of Prince were negotiating a settlement of their dispute, House of Prince and Carolina signed a "Contribution Regarding Settlement with the States"

("Contribution Agreement"), which limited the amount of the escrow funds for which Carolina could be liable, and that would be subject to the security interest, to $31,009,757, "upon consummation of a mutually and reasonably agreeable settlement with the States," House of Prince and Carolina.  ER Tab 36, STATES 1097.

Meanwhile, Carolina engaged another company to manufacture its cigarettes until August 26, 2004, at which point the replacement company liquidated.  Carolina then made arrangements to lease and own the necessary facility and equipment, which it began to do in February of 2005. Meanwhile, Carolina sought temporary restraining orders to stop the Settling States from delisting it from the directories of manufacturers.  However, it could not make the 2004 escrow deposits by April 15, 2005.

As a result of the litigation costs to stop the Settling States from delisting it, as well as the large capital outlay necessary to own and lease its facility and equipment, Carolina filed a Chapter 11 petition.  Part of its petition was to seek to stay the States from collecting the 2004 escrow deposits.

The Bankruptcy Court confirmed a Plan that allows Carolina until December 2007 to pay its escrow deposit obligations, which total about $6.75 million.  Carolina may extend the compliance date until December 2009 if it needs to, in order to keep at least $1 million in working capital.  Carolina must pay interest.  The States appeal the Order Confirming Third Amended Plan of Reorganization Dated October 18, 2005  (As Modified February 24, 2006), and Carolina has filed a cross-appeal.

Page 5 - OPINION AND ORDER

**DISCUSSION**

I.    <u>The States' Appeal</u>

The States challenge the bankruptcy court's decision on four grounds:  (1) the escrow

deposit obligations are not "claims" under the Bankruptcy Code; (2) the Plan was not proposed in

good faith and violates state law; (3) the claims have been improperly classified; and (4) the Plan

unfairly discriminates among the classes.

A.    <u>Whether the Escrow Deposits are "Claims"</u>

The States challenge the bankruptcy court's conclusion that the prepetition NPM escrow

deposits are claims.

The standard of review is disputed.  The States contend that the standard of review is de

novo because the issue is a matter of law.  Carolina asserts that whether a creditor has a claim is a

question of fact, requiring the reviewing court to uphold the bankruptcy court's conclusions

unless the court committed "clear error."  <u>In re Cossu</u>, 410 F.3d 591, 595 (9th Cir. 2005).

Carolina's assertion is based on the appellant's argument in <u>In re Cossu</u>.  In its

application, the court used a de novo standard of review.  Furthermore, questions of statutory

interpretation are reviewed de novo.  <u>Trustees of the Amalgamated Ins. Fund v. Geltman Ind.,</u>

<u>Inc.</u>, 784 F.2d 926, 929 (9th Cir. 1986).  Accordingly, I will apply a de novo standard of review.

1.    <u>Whether the Requirement to Save is an Enforceable Obligation</u>

A "claim" is, in relevant part, a

(A)    right to payment, whether or not such right is reduced to judgment, liquidated,
        unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal,
        equitable, secured, or unsecured;

11 U.S.C. § 101(5). The bankruptcy court explained that the definition for "claim" is broad, in order "to ensure that 'all legal obligations of the debtor, *no matter how remote or contingent*, will be able to be dealt with in the bankruptcy case.'" Memorandum Opinion Re Confirmation of Plan ("Opinion") at 6, citing In re Jensen, 995 F.2d 925, 929 (9th Cir. 1993) (emphasis supplied by 9th Circuit). The bankruptcy court adopted the Supreme Court's definition for "right to payment" as an "enforceable obligation," id., citing Pennsylvania Dep't of Public Welfare v. Davenport, 495 U.S. 552, 559 (1990), and determined that the legislation requiring escrow deposits creates an enforceable obligation. As a result, the escrow deposits constitute "claims" for purposes of the bankruptcy statute.

Under the statutory definition for "claim," the States argue that they have no current right to the escrow deposits, and that as a result the escrow deposits are not a right to payment. Rather, Carolina is simply compelled to save its own money. There is no "obligation to pay" anyone. The States distinguish Pennsylvania Dep't of Public Welfare. In that case, the debtor was required to pay money *to* the government. In essence, the States argue that not *every* enforceable obligation is a claim. For example, a creditor's right to demand specific performance is not a claim, whereas money damages in lieu of performance is a claim. In re Chateaugay Corp., 944 F.2d 997 (2nd Cir. 1991).

Carolina responds that the States' right to compel the company to pay a certain percentage of its sales to the Escrow Account for the States' benefit constitutes a claim. Carolina points out that here it deposits the escrow monies in accounts on which each State is named as the beneficiary. Except for interest earned on the funds, the money can only be released: (1) if there is a judgment and settlement of released claims against Carolina, in which case the money

is paid to the States; (2) if the States acknowledge that Carolina has made an excess deposit, in which case the bank can only release the money to Carolina upon instruction from the States; and (3) if there are no judgments or settlements on released claims after 25 years of the original deposit, Carolina will receive the money if the States do not object to its return to Carolina. As a result, all that Carolina has is a residual interest in the money, and so while the money does not go to the States it is the States who control the money deposited.

In addition, Carolina asserts that money need not be paid to the States in order for it to be considered a claim. For example, a disgorgement order where the money is not paid to the SEC does not change the fact that the SEC is a creditor. In re Sherman, 441 F.3d 794, 807 (9th Cir. 2006). An order to clean up environmental waste is a "claim" even though the state will not receive any money. Ohio v. Kovacs, 469 U.S. 274, 279 (1985).

I find that the bankruptcy court properly applied the broad definition of "claim," and found that "[b]ecause the escrow obligations are legal obligations of [Carolina] to pay that the states are entitled to enforce," the obligations are claims. Opinion at 7. I acknowledge the States' argument that not every enforceable obligation is a claim, but I find this to be the kind of enforceable obligation that is a claim. The factors I have considered include the following: Carolina is required to make the escrow deposits in order to do business in the States, the States enforce that obligation, Carolina has no access to the money without the States' approval, and the escrow deposits are solely for the benefit of the States.

2.    Financial Assurance Obligations

The States argue that the analog to the Escrow Deposit Statutes is financial assurance obligations, such as surety bonds or letters of credit. The bankruptcy court rejected the cases

cited by the States because none of them directly addressed the question of whether such financial assurance obligations could be claims. The States argue that the bankruptcy court missed the point–the outcome of those cases would have been different had the financial assurance obligations been claims.

The States explain that in order to enforce a bond obligation (e.g. the right to shut down a debtor's operations due to the absence of a bond), the obligation must be both one to which the police power applies and *not be a claim*, because the police power exception to the automatic stay does not allow enforcement of money judgments.[2] The States rely on the case of <u>Safety-Kleen, Inc. v. Wyche</u>, 274 F.3d 846 (4th Cir. 2001), and explain it like this:

> The state may, for instance, sue to determine the liability and amount of damages owed by a debtor to clean-up a polluted facility without violating the stay [citation omitted], but that does not allow it to demand payment of an amount so determined, on pain of closure of the facility. Yet, the state *was* allowed to require Safety-Kleen to post the bond and to shut down the landfill when that was not done. [citation omitted]. The difference could only be because the bond requirement–the analog to the escrow obligation here–was not a monetary judgment or claim.

Reply Brief of Settling States at 9.

I disagree with the States' conclusion. The outcome of those cases would only have been different had the financial assurance obligations been *money judgments*. The order could be a

_____

[2]Section 362 provides:

(b)    The filing of a petition under . . . this title, . . . does not operate as a stay–. . .

(4)    under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's . . . police and regulatory power, including the enforcement of a judgment **other than a money judgment,** obtained in an action or proceeding by the governmental unit to enforce such governmental unit's . . . police or regulatory power. (Emphasis added).

claim, but not be a money judgment.    The Third Circuit has set forth a test to determine whether

an order is a "money judgment," and the criteria are narrower than apply to the term "claim."  For

example, "an important factor in identifying a proceeding as one to enforce a money judgment is

whether the remedy would compensate for *past* wrongful acts resulting in injuries already

suffered, or protect against potential *future* harm.  Thus, it is unlikely that any action which seeks

to prevent culpable conduct *in futuro* will, in normal course, manifest itself as an action for a

money judgment or one to enforce a money judgment."  Penn Terra Ltd. v. Department of Envt'l

Resources, 733 F.2d 267, 276-77 (3d Cir. 1984) (emphasis in original).  As the court in Safety-

Kleen recognized, financial assurance obligations are intended to protect against future harm by

deterring misconduct.  Accordingly, such financial assurance obligations are not money

judgments, and may be enforced under the exception to the automatic stay.  This says nothing

about whether financial assurance obligations are, or are not, claims.

> 3.    Additional Arguments About Whether the Escrow Deposit Obligations are
> Claims

In addition, the States take issue with the bankruptcy court's consideration of the

legislative scheme as a whole.  The bankruptcy court found that even though the States' right to

sue and obtain judgment is contained in a different statute from the requirement that NPMs make

escrow deposits to pay for any judgment, the "[p]ayment of any claims that the states may have

against debtor for its 2004 operations is assured by the amounts debtor is obligated to pay into

escrow for 2004 sales."  Opinion at 8.  The States argue that although the escrow deposit statutes

make it more likely that demands will be paid, they are not claims in and of themselves.

Page 10 - OPINION AND ORDER

In addition, the bankruptcy court rejected Carolina's attempt to schedule the escrow deposit obligations as tax claims. The States argue this rejection is contrary to the bankruptcy court's finding that the obligations are claims. The bankruptcy court noted that cases "discussing whether a payment required to be made to a state . . . is a tax or a fee or something else are not helpful in determining whether a payment that is required by statute and enforceable by the state, *but not paid directly to the state*, is a tax." Opinion at 15 (emphasis added). In addition, the bankruptcy court noted that the escrow funds may never benefit the States and may be returned to the NPM, concluding that the escrow deposit merely "provides assurance of payment for possible liability. *It is not a payment to the states* to help the states defray their costs of government or their undertakings." Id. at 18 (emphasis added). According to the States, this is the logic that applies to the question of whether the escrow obligations are claims in the first place. According to the States, "if the escrow obligations are not *tax* claims, by the same reasoning they are not claims at all." Opening Brief at 26.

Finally, the States are concerned that they will be unable to protect their citizens using financial responsibility requirements if entities are able to file bankruptcy. If the financial responsibility requirements are claims, they can be discharged thereby "undermining their protective function." Opening Brief at 27. The States are also fearful that NPMs could "deliberately 'under price' their product to gain market share and not make their statutory deposits with the knowledge that the Settling States can be forced to allow them many years to make up the deficiency." Id.

Page 11 - OPINION AND ORDER

I find that the bankruptcy court properly reviewed the statutory scheme as a whole, and I agree with Carolina that the ramifications of the bankruptcy court's decision are irrelevant for purposes of my review of the decision.

As for the analysis of tax claims, although the States are correct that the bankruptcy court mentioned the payments were "not paid directly to the state," the court also noted that the funds were not "otherwise available to the States for any use." Opinion at 14. In this de novo review, the latter conclusion is the important one. Accordingly, I find that this is one of those "claims" that is "not in the nature of taxes," <u>In re George</u>, 361 F.3d 1157, 1163 (9th Cir. 2004), and that the bankruptcy court's conclusions that the escrow deposit obligations were claims but not tax claims were not contradictory.

B.     <u>Whether the Plan Complies with Sections 1129(a)(3) and 1123(a)(5)(G)</u>

Section 1129(a)(3) requires that the Plan be proposed in "good faith and not by any means forbidden by law." The court reviews de novo whether the Plan is proposed "by any means forbidden by law."

The States argue that the Plan permits Carolina to violate the law for 46 months after confirmation, because the company need not make its 2004 escrow deposits immediately, and is therefore "proposed by a means forbidden by law." Unless preempted by the Bankruptcy Code, state laws remain in place and a debtor must be able to comply with those state laws for a plan to be confirmed.

The bankruptcy court avoided the problem above by applying Section 1123(a)(5)(G) which provides: "Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . (5) provide adequate means for the plan's implementation, such as – . . . (G) curing or waiving of

Page 12 - OPINION AND ORDER

any default."  The States argue, however, that the Ninth Circuit has interpreted the phrase

"notwithstanding any otherwise applicable nonbankruptcy law" to mean a nonbankruptcy law

can be ignored only if it relates to the debtor's "financial condition."  See Pacific Gas and Elec.

Co. v. California ex rel. California Dept. of Toxic Substances Control, 350 F.3d 932, 937 (9th

Cir. 2003).

The States admit that "financial condition" has not been defined in the Ninth Circuit, but

argue that it appears to be related to actions triggered by a bankruptcy filing or the debtor's

insolvency, as opposed to operating conditions, citing to a handful of cases.  In re American

Freight Sys., 179 B.R. 952 (Bkrtcy. D. Kan. 1995) (Section 1142–a statute similar to

1123(a)(5)–could not be used to override the regulatory constraints on non-operating businesses);

In re Transcon Lines, 58 F.3d 1432 (9th Cir. 1995) (status of "not transporting property" not

related to "financial condition"), but In re Pearson Indust., Inc., 152 B.R. 546, 557 (Bankr. C.D.

Ill. 1993) (state law barring stock redemptions if company was "insolvent" was preempted by

Section 1142).  Here, nothing in the Escrow Deposit Statute is tied to the NPM's financial

condition, insolvency or bankruptcy filing.  Instead, the law applies equally to any NPM seeking

to sell cigarettes in the Settling States.  According to the States, "financial condition" deals with

the debtor's overall profitability, not whether it has complied with an operating requirement to

maintain a certain level of insurance.

The bankruptcy court rejected the above analysis, stating that the cases came from outside

the circuit, "and so are not particularly helpful."  Opinion at 28.  The States criticize the

bankruptcy court for failing to analyze the cases as potentially persuasive authority.

Most of the cases to which the States cite are not binding authority. However, I note that In re Transcon Lines declared, "The term 'financial condition' represents a concept that is somewhat broader than operational status. In some cases, especially when a business has no potential source of significant revenues other than from its operations, a business's operational condition and financial condition might be considered one and the same." 58 F.3d at 1440. The Ninth Circuit held differently in that case only due to the "unusual nature of the motor freight industry." Id. Having given the bankruptcy court's decision de novo review, I find that since the Escrow Deposit Statutes would preclude Carolina from selling cigarettes if the company failed to make the escrow payments, making escrow deposits relates to financial condition.

Additionally, the States argue that the bankruptcy court erred in finding that Carolina could "cure" by complying with the deposit requirements. The States assert that, just like with insurance, a person cannot cure a failure to have insurance on day 1 by showing he will have insurance on day 10. The States concede that the court stated in a footnote it was not "making any comment on debtor's argument that, if it pays the prepetition escrow deposits in full, it will have cured the default that gave rise to the imposition of penalties, and will thus be relieved of any obligation to pay penalties." Opinion at 28 n.8. However, according to the States, "[w]hile the court left the issue open, its opinion clearly takes the view that compliance by December 2009 (46 months after confirmation) would "cure" the violation so as to meet the requirements of Section 1129(a)(3). *Absent that critical finding, the court could not have confirmed the plan, even if it ruled against the Settling States on all other issues*." Reply Brief of Settling States at 14 (emphasis in brief).

Page 14 - OPINION AND ORDER

In a letter submitted to this Court, after the briefing schedule concluded, the States asserted that the bankruptcy court issued a subsequent opinion dealing with the issue of whether the Plan as proposed "cured" the default, thereby avoiding the States' demand for penalties. The bankruptcy court held, in an interim order, that the Plan does not "cure" the default, for purposes of penalties, since it does not provide for correction of the default until well after confirmation. Carolina objected to the States' provision of this interim order to the Court, arguing that it is not relevant to any issues on appeal. In addition, Carolina argued that the bankruptcy court did not indicate the most recent order was contrary to the one on appeal, and that the interim order does not become final until the remaining issues regarding allowance/disallowance of the penalty claims are resolved. Finally, Carolina argued that substantively, the order is inapplicable.

I agree with Carolina that the bankruptcy court did not base its decision on a finding that payment of escrow deposits over time "cures" the default. Instead, the bankruptcy court appeared to rely on the language of the statute that requires a plan to "provide adequate means for the plan's implementation, *such as*" "curing or waiving of any default." The bankruptcy court explicitly avoided a finding that the Plan cured the default and, based on the analysis in its interim order, could not have come to such a conclusion in any event. Instead, the court stated that the Plan "[p]rovides for paying that financial obligation over time. Debtor's proposal to pay the prepetition escrow deposits over time is not forbidden by law, even though it means that debtor will be out of compliance with state law until the prepetition escrow deposits are made." Opinion at 28. Payment of a debt over time can constitute "adequate means for the plan's implementation." Collier on Bankruptcy 1123.01[3] (2005).

Page 15 - OPINION AND ORDER

Therefore, as the bankruptcy court held, Carolina's Plan is "proposed in good faith and not by any means forbidden by law."

C.    Classification of Claims

The States take issue with the bankruptcy court's approval of Carolina's classification of claims.

Section 1129(a)(10) requires that there be at least one consenting class of impaired claimants for a plan to be confirmed.  Section 1123(a)(1) requires the plan to designate classes of claims and Section 1122 requires the claims in those classes to be "substantially similar."  The petitioner is not to gerrymander the classes in order to obtain approval of a plan.  The finding that a claim is or is not substantially similar is reviewed under the clearly erroneous standard.  In re Johnston, 21 F.3d 323, 327 (9th Cir. 1994).

The Plan has the following classes:  (1) States' escrow deposit obligations; (2) States' penalty claims (which arise from Carolina's failure to make the 2004 escrow deposits); (3) ten general unsecured claims totaling $65,000 (approximately 90% of which is owed to Tideline) ("Class Three claims"); (4) $356,000 CPI-NV claim (owed on a note signed only by Tideline) ("Class Three A claims"); and (5) the $105 million House of Prince claims.

The States argue generally that the bankruptcy court erred in approving all of these classes for a handful of claims because they were only created to give Carolina multiple chances to obtain the approval of one impaired class.  The States also identify several specific problems with the claims identified by Carolina.

Page 16 - OPINION AND ORDER

1.    The States' Escrow Claims and Penalty Claims

The States argue the escrow claims and penalty claims should have been included in the class with the ten general unsecured claims. If they had been, the class would have opposed the Plan.

The bankruptcy court explained its approval of the separate classes on the basis that the escrow deposit claims were for statutory obligations, and the States could access the escrow fund to fulfill any judgments while the other unsecured creditors could not. In addition, Carolina had a business justification for the separate classification because it "cannot operate postpetition without complying with state law which includes the requirement that it make the escrow deposits." Opinion at 21.

I cannot say the bankruptcy court clearly erred in classifying the claims as it did. The bankruptcy court correctly noted that "Section 1122 says that only claims that are substantially similar may be classified together; it does not say that all substantially similar claims must be included in a single class." Opinion at 19. In addition, the Class Three claims are different in kind from the escrow and penalty obligations. The general unsecured claims are based on contractual liabilities to vendors and service providers, whereas the States' claims are statutorily required for the benefit of the States, and the general unsecured creditors have no access to the escrow accounts. Accordingly, the bankruptcy court did not clearly err in classifying the Class Three claims and the States' claims separately.[3]

---

[3]The States also complain that Tideline, Carolina's affiliate, is paid by December 2006 while the States and tax creditors must wait up to three more years, and therefore the Plan "unfairly discriminates" in violation of Section 1129(b). However, the bankruptcy court did not clearly err in concluding, "[Carolina] has a reasonable basis for proposing to pay the escrow deposits over time; it needs to accumulate the cash with which to make the payments." Opinion

In addition, although the States complain that the penalty obligations cannot be segregated from the escrow obligations, I find the bankruptcy court did not clearly err in ensuring Carolina comes into compliance with its prepetition obligations quickly by delaying payment of the penalty claims.

In addition, the States' reliance on <u>United States v. Noland</u>, 517 U.S. 535, 541 (1996) is to no avail. In that case, the Supreme Court barred categorical subordination of penalty claims, but permitted courts to evaluate the issue on a case by case basis pursuant to Section 510(c). Here, the bankruptcy court determined that Section 510 was not implicated because the Plan does not subordinate the penalty claims, but pays them in full after the other claims have been paid in full. Regardless of whether the bankruptcy court was correct about whether the Plan's treatment of the penalty claims constitutes subordination, in the end the bankruptcy court did not err in determining that deferring payment of penalty claims will help to ensure that Carolina comes into compliance with state law more quickly. I cannot fault this determination.

2.    The CPI-NV Claim

The States assert that CPI-NV should not have been allowed to vote on confirmation of the Plan because the claim is not properly classified nor is it an obligation of Carolina's. CPI-NV is a Belgium company which worked on behalf of Carolina to find House of Prince. CPI-NV also negotiated a contract manufacturing agreement with House of Prince on behalf of Carolina. Carolina explains that its affiliate, Tideline, is jointly and severally liable for the obligation, which is approximately $560,000 over ten years. Carolina included the obligation in Class Three initially, but in response to the States' objection, moved it to Class Three A and proposed to pay

at 36.

the claim over eight years.  The States argued at the confirmation hearing that the claim should

not be included at all since it is not an obligation of Carolina's.

The bankruptcy court stated, "A party cannot raise an objection to plan confirmation as a

substitute for objecting to a claim.  I agree that there are serious questions about whether the

claim of CPI-NV is allowable.  If there is an objection filed to CPI-NV's claim, I will consider

whether to allow it.  The claims objection process exists precisely to resolve such disputes.  Plan

confirmation is not the appropriate time to resolve such issues."  Opinion at  24-25.  A trial

court's interpretation and application of a local rule is reviewed for an abuse of discretion.

Hinton v. Pac. Enter., 5 F.3d 391, 395 (9th Cir. 1993).

Carolina served the Notice of the Disclosure Statement Hearing and Order Conditionally

Approving the Disclosure Statement on August 25, 2005.  In that Order, the States were told,

"Any objections to claims filed more than 10 days after the service date **of notice** shall not affect

the amount of the allowed claim for the purpose of voting on, objecting to, determining creditor

acceptance of, or otherwise determining whether to confirm the applicable plan, or any

modifications thereto, referred to in **this notice**."  ER Tab 22, STATES 771 (emphasis added).

Additionally, Local Rule 3007.1 tracks this language.  The Local Rule, in essence, permits

objections to claims within 10 days after the "mailing date of **any** notice of disclosure statement

hearing" and any objections filed after that date will not affect the plan "referred to in **such**

**notice** of disclosure statement hearing."  Local Rule 3007.1(C) (emphasis added).  The States

had not filed an objection at the time of the confirmation hearing.

I reject the States' argument that the bankruptcy court did not rely on Local Rule 3007.1

in holding the way it did.  Although the bankruptcy court declined to accept a similar argument in

a separate proceeding when it was made by CPI-NV, States Supp. ER 108, STATES 3450-52, it was only because the court specifically invited the objection in its Opinion that the States could raise it after the deadline.

The court properly refused to consider the States' objection to the CPI-NV claim, made in the Plan confirmation process, and did so implicitly pursuant to the August 25, 2005 Order and Local Rule 3007.1.  The States could have filed objections to the CPI-NV claim prior to the confirmation hearing, but failed to do so.  The bankruptcy court did not abuse its discretion in rejecting the States' objections to the CPI-NV claim during the confirmation hearing.

3.    The House of Prince Claim

As explained in the background section of this memorandum, Carolina entered into a contract with House of Prince to produce Carolina's cigarettes.  As a result of concerns about the States' demand for escrow deposit payments, on March 15, 2002, House of Prince and Carolina entered into a Security Agreement in which Carolina granted House of Prince a security interest in its residual interest in the Escrow Account.

On May 15, 2003, House of Prince and Carolina entered into a Contribution Agreement, whereby Carolina agreed to contribute $31,009,757 of the funds on deposit in the Escrow Account upon consummation of a mutually and reasonably agreeable settlement between the States, Carolina and House of Prince.

House of Prince, and an affiliated entity,[4] filed partially secured claims for $105 million on August 23, 2005.  The amount was based on the suit California filed against House of Prince, seeking payments under the Master Settlement Agreement for cigarettes House of Prince

---

[4]Both entities are collectively referred to as House of Prince.

Page 20 - OPINION AND ORDER

manufactured for Carolina.  The Settling States agreed, prior to the bankruptcy, to settle the

California Litigation, limiting House of Prince's liability to about $48 million, in a global

settlement agreement ("GSA").  In addition, under the GSA, Carolina must satisfy the

Contribution Agreement and release $31 million from the Escrow Account.  The States must

obtain approval of the GSA from the TPMs that were part of the Master Settlement Agreement

pursuant to a provision in that agreement.  All of the parties have executed the GSA and the

bankruptcy court has approved it, but the States have not yet obtained approval from the TPMs.

On August 29, 2005, Carolina filed objections to the House of Prince claims.  On

September 9, Carolina entered into a stipulation with House of Prince allowing a combined claim

in the amount of $105 million for voting purposes only.  The stipulation was served on the

States, but the States claim no opportunity to object was provided.

a.        Section 502(e) Argument

The bankruptcy court rejected the States' Section 502(e) argument, stating, "The states'

502(e) argument is the basis for a claim objection, not for an objection to confirmation."

Opinion at 32.  The States challenge this decision.  A trial court's interpretation and application

of a local rule is reviewed for an abuse of discretion.  Hinton v. Pac. Enter., 5 F.3d 391, 395 (9th

Cir. 1993).

As the bankruptcy court pointed out, a Section 502(e) argument is the basis for a claim

objection, not a plan objection.  As explained in the section above, on the CPI-NV claim, in an

August 25, 2005 Order, the bankruptcy court provided, "Any objections to claims filed more than

10 days after the service date **of notice** shall not affect the amount of the allowed claim for the

purpose of voting on, objecting to, determining creditor acceptance of, or otherwise determining

Page 21 - OPINION AND ORDER

whether to confirm the applicable plan, or any modifications thereto, referred to in **this notice**."
ER Tab 22, STATES 771 (emphasis added).

The States argue that the applicable notice date is the August 11 date (the date when
Carolina filed its Notice of Hearing on its first disclosure statement), not August 25. I reject the
States' argument. Local Rule 3007.1(C) is substantially similar to the language in the bankruptcy
court's August 25 Order, and it is helpful in construing the meaning of the August 25, 2005
Order. The Local Rule permits objections to claims within 10 days after the "mailing date of **any**
notice of disclosure statement hearing" and any objections filed after that date will not affect the
plan "referred to in **such notice** of disclosure statement hearing." Local Rule 3007.1(C)
(emphasis added). Thus, the language quoted above from the August 25 Order, intended
objections to be filed within 10 days after the service date of the August 25 Order–not the earlier
August 11 notice. Instead of complying with the Order, the States waited until the hearing held
on September 26, 2005 to make their Section 502(e) objection. The bankruptcy court did not
abuse its discretion in rejecting the States' untimely objection.

                    b.      Whether the House of Prince Claim is Impaired

In addition, the States dispute the bankruptcy court's conclusion that the House of Prince
claim is impaired because House of Prince is getting everything Carolina agreed to give it under

the Contribution Agreement.[5]  The bankruptcy court held that the claim was impaired because the Plan did not provide for payment of the full $105 million listed in the House of Prince claim.

The statute provides, "[A] class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan – (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest . . . ."  11 U.S.C. § 1124.  Both parties agree that whether a claim is impaired under Section 1124 is a question of law, subject to de novo review.  In re Acequia, Inc. 787 F.2d 1352, 1357-58 (9th Cir. 1986).

The States argue Carolina's actual liability to House of Prince is limited by the Contribution Agreement.  While the States may seek payment of the full $105 million from the House of Prince, that says nothing about Carolina's liability to the House of Prince.  According to the States, the bankruptcy court did not appreciate the effect of the Contribution Agreement on House of Prince's claim.  The parties agreed that Carolina would only pay House of Prince $31 million to satisfy its indemnity obligations.  It is irrelevant that House of Prince listed a higher amount in its claim.  A claimant with a promissory note for $5,000 is not impaired if it is paid $5,000, even if it filed a proof of claim for $10,000.  According to the States, because Carolina's Plan offered House of Prince exactly what it was entitled to under the Contribution Agreement,

_____

[5]The bankruptcy court focused on the effect of the GSA, rather than the Contribution Agreement, finding that the GSA did not make the House of Prince claim unimpaired because the GSA and Plan did not propose to pay the full amount of the claim.  Specifically, in the GSA, the States agreed to limit the liability of House of Prince to $48 million, as it related to Carolina, and the Plan provided for payment of $31 million from Carolina's Escrow Account, in satisfaction of the Contribution Agreement.  House of Prince must pay the $17 million difference to the States.

its claim was unimpaired and could not provide a supporting class, regardless of whether the GSA ever became effective.

I reject the States' argument.  The Contribution Agreement only comes into play upon the consummation of the GSA between the States, Carolina and House of Prince.  Since the States have yet to obtain the approval of the TPMs subject to the Master Settlement Agreement, the GSA is not yet in effect.  As a result, because the Contribution Agreement is contingent on the GSA, the parties are left with the Security Agreement, in which Carolina granted House of Prince a security interest in "all money which has been, should have been or will be deposited in a qualified escrow account."  ER Tab 36, STATES 1010.  In addition, the initial contract between Carolina and House of Prince provided that Carolina would hold House of Prince harmless from liabilities to the Settling States.  Since the Plan alters House of Prince's rights under these agreements, its claim is impaired.

    D.    <u>Whether Plan is Fair and Equitable and does not Unfairly Discriminate</u>

The States claim the bankruptcy court erred in finding that the Plan met the requirements of Section 1129(a)(3) (must be "proposed in good faith"), and Section 1129(b)(1) (must not "discriminate unfairly" and must be "fair and equitable" with respect to each dissenting class).

"Good faith is assessed by the bankruptcy judge and viewed under the totality of the circumstances . . . .  The bankruptcy judge is in the best position to assess the good faith of the parties.  Good faith requires that a plan will achieve a result consistent with the objectives and purposes of the Code."  <u>In re Jorgenson</u>, 66 B.R. 104, 108-109 (9th Cir. BAP 1986).  Good faith is reviewed for clear error.  <u>Id.</u>

The States assert that Carolina separately classified claims in order to avoid the voting rights of the States, and to impair a *de minimis* class of votes in order to establish a supporting class to "cram down" the States as dissenting creditors. The States argue that Carolina artificially impaired the Class Three claims (ten general unsecured claims totaling $65,000 (approximately 90% of which is owed to Tideline) and the $356,000 CPI-NV claim (owed on a note signed only by Tideline)). The States contend that Carolina could pay the $65,000 at confirmation, and could make the first installment of $40,000 on the CPI-NV claim at confirmation, and still have $660,000 in reserves throughout 2006–an amount two to three times higher than what it had previously been able to operate under.

The bankruptcy court found Carolina would need a $1 million cushion and stated that payment of the Class 3 claims would leave Carolina with only a $500,000 cash balance, using projections submitted on October 11, 2005. The States assert that the court should have used the cash balance projections of January 10, 2006, showing the lowest cash balance in 2006 to be $1,067,202. According to the States, Carolina could pay the Class 3 claims without dipping much below the $1 million mark.

Other evidence, according to the States, demonstrates Carolina's bad faith. It originally characterized the escrow obligations as tax claims so it could take until December 2011 to comply with the statutes. After the States challenged this treatment, the bankruptcy court finally required Carolina to include language in the Plan accelerating the deposits if it had excess cash.

As for whether the Plan is "fair and equitable," the States argue that the bankruptcy court should have considered the totality of the circumstances. The States argue that from the beginning Carolina was obstreperous. It forced the States into litigation as to the meaning of the

applicable statutes, then changed its strategy to try to comply with the statutes while diverting

funds that should have been used for the escrow deposits.  Carolina then filed bankruptcy where

it attempted to categorize the escrow obligations as tax claims, formed three separate classes for

twelve claims, manipulated close ties with entities in Class Three in order to get confirmation

votes, and proposed a minimum balance of $5 million (as opposed to the $1 million that ended

up in the Plan).  The States also assert that the fact that confirmation rests solely on the House of

Prince vote "would mean that the court must find that it is appropriate to use the vote of a party

that conspired with Carolina to avoid payment of tens of millions in [Master Settlement

Agreement] payments and that assisted Carolina in circumventing the Settling States' tobacco

laws, as the basis for allowing Carolina to *continue* to violate the laws of the Settling States."

Opening Brief at 49.

      I could not say that the bankruptcy court clearly erred in finding the good faith test met.

Carolina hired a financial consultant who opined that the company needed at least $1 million in

cash reserves in order to operate.  The bankruptcy court's acceptance of that opinion is not

clearly erroneous.  Regardless of the different cash flow projections, if Carolina had paid the

Class Three and Class Three A claims upon confirmation, it would have dipped below the $1

million threshold.  The bankruptcy court looked at all the circumstances, including whether it

was acceptable to allow the payment of the escrow deposits to be paid over time, given the huge

amount owed to the States.  The bankruptcy court's conclusions are not clearly erroneous.

II.    Carolina's Cross-Appeal

      Carolina asserts that the bankruptcy court erred in four respects.  According to Carolina,

(1) the States' equitable rights constitute claims; (2) the States should be prohibited from

Page 26 - OPINION AND ORDER

asserting that Carolina is not the manufacturer of the cigarettes that generated the sales upon

which the escrow deposits are based; (3) the States' escrow deposit claims are tax claims; and (4)

the bankruptcy court had no authority to require escrow deposits be made on a monthly basis.

      A.     <u>Whether Specified Equitable Rights are Claims</u>

      Carolina proposed that the definition of "States' Allowed Claims" in the Plan should

include, "any claim, remedy or cause of action the States may have based upon a State's assertion

that Carolina was not the TPM for the" relevant cigarettes.  ER Tab 64, STATES 1623.  Carolina

argues that the bankruptcy court erred in rejecting the notion that the States' right to delist or

otherwise prohibit the company from selling cigarettes is a claim under 11 U.S.C. § 101(5)(B).

Indeed, the States appear to assert that they can keep the escrow deposits based on Carolina's

*violation* of the Escrow Deposit Statutes by selling cigarettes when it was not the TPM.  Carolina

asserts that these remedies are an equitable right for breach of the Escrow Deposit Statutes.  The

standard of review is de novo.

      A "claim" is, in relevant part, a

     (B)     right to an equitable remedy for breach of performance if such breach gives rise to a
            right to payment, whether or not such right to an equitable remedy is reduced to
            judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or
            unsecured.

§ 101(5).

      According to Carolina, if the States take the position that they can keep the escrow

deposits even if Carolina is determined by a court not to be a TPM, then the States are effectively

arguing that a breach of those statutes provides them with a right to payment for that breach.

"The fact that the States can force [Carolina] to stop selling cigarettes is an equitable remedy for

Page 27 - OPINION AND ORDER

breach of performance (not being the manufacturer), the breach of which gives rise to a right to payment (retention of the escrow deposits already paid on those sales)."  Carolina's Cross-Appeal at 45.

The States respond that Carolina failed to raise this analysis below, and should be estopped from doing so now.  Even if the Court considers the argument, there is no "breach of performance" of any "obligation" by any entity to be a TPM.  The States assert that there may be an obligation here only because Carolina forced its cigarettes into the States and judicial estoppel might require that the deposits be made.  But, if the States succeed in obtaining the deposits it will not be because Carolina has breached some obligation "not" to be the TPM, but will be *despite* the fact that it was not the TPM.[6]

I agree with the States that Carolina did not raise the argument below.  Carolina argued before the bankruptcy court that the right to delist Carolina and sue it for *penalties* is an equitable remedy the breach of which gives rise to a right to payment, not that the States may be entitled to keep the escrow deposits.

Failure to raise an argument below may be overcome by exceptional circumstances, such as where the issue is one of law.  In re Burnett, 435 F.3d 971, 976 (9th Cir. 2006).  This is an issue of law so I will address it.  Nevertheless, I still agree with the States.  It is apparent from the States' response that if they are permitted to retain the escrow deposits, it will be on the basis of

---

[6]The States explain in their response that normally, if a party is determined not to be a TPM, it may not sell cigarettes in the States and need not make deposits.  If it is initially listed, but removed upon a state's subsequent decision that another party was the TPM, the state would usually return the money to the first party and demand the deposit or Master Settlement Agreement payments from the correct party.  The situation is complicated here by the fact that the true manufacturers are in South Africa, one is bankrupt, and it may be impossible to make the other company register and make deposits.

judicial estoppel, not because Carolina breached the Escrow Deposit Statutes. Accordingly, Carolina has not persuaded me that the States have an equitable right that could be considered a claim for purposes of the Plan.

      B.    <u>Whether States can Assert Carolina is not the TPM</u>

      Carolina suggested that the Plan provide that the States could not act against the company "regarding or relating to the enforcement of their Prepetition Escrow Deposit Claims or the States' Allowed Claims (including Delisting or any other action to prohibit [Carolina] from selling product in such States due to the Debtor's failure to pay the Prepetition Escrow Deposits) so long as [Carolina] makes the payments to the States required under [the] Plan." ER Tab 64, STATES 1623-24. The bankruptcy court did not allow Carolina to include this language in the Plan.

      The reason Carolina requested this language was to prevent states from obtaining escrow deposits through the Plan (tacitly recognizing that Carolina was a TPM), while at the same time taking the position outside this context that Carolina was not a TPM. Carolina argues that the States are precluded by res judicata or judicial estoppel from arguing that Carolina is not the TPM of the cigarettes manufactured prepetition for which the States have received escrow deposits or will receive escrow deposits under the Plan.

      I note that the bankruptcy court wrote Carolina asking if it was "willing to live with a plan that eliminates the TPM issue from its definition of States' Allowed Claims." ER 56, STATES 1467-68. Carolina wrote back that it was "willing to proceed toward confirmation" without additional reservations. ER 57, STATES 1470. It is unclear to me what effect

Carolina's concession should have on this appeal, but since the bankruptcy court discussed the issue, I will evaluate the bankruptcy court's decision.

I find that the bankruptcy court did not abuse its discretion in refusing to approve the language proposed by Carolina. Under the Plan, if Carolina is the TPM, it must make the required deposits for 2004 sales and the States are barred from delisting it for any reason having to do with the failure to make those deposits. If the States proceed with TPM litigation outside the bankruptcy context, the States may argue that Carolina is not the TPM but cannot have the deposits released until the true TPM makes them. Carolina may argue to the contrary at that time. The bankruptcy court did not abuse its discretion in refusing to include the language requested by Carolina.

      C.     <u>Whether Escrow Deposits Constitute Tax Claims</u>

Carolina argues that the bankruptcy court erred in finding the escrow deposit obligations to be a general unsecured claim as opposed to a tax claim. This is an issue of law subject to de novo review.

The term "tax" is not defined in the Bankruptcy Code, but courts are to apply a four-part test. A tax is (1) an involuntary pecuniary burden, regardless of name, laid upon individuals or property; (2) imposed by, or under authority of the legislature; (3) for public purposes, including the purposes of defraying expenses of government or undertakings authorized by it; and (4) under the police or taxing power of the state. <u>In re Lorber Indus. of Cal., Inc.</u>, 675 F.2d 1062, 1066 (9th Cir. 1982).

The bankruptcy court held that the payments did not meet the third requirement since,

> the escrow deposits do not serve to defray expenses of government, either in
> regulating the industry or in providing governmental services to the public.
> Instead, the escrow deposits assure the payment of damages that might be awarded
> in litigation the states may commence against an NPM for wrong-doing connected
> with its sale of cigarettes.  If the NPM does not engage in any conduct that gives
> rise to liability, or if the state chooses not to bring an action against an NPM for
> any such misconduct, the fund will never benefit the state by defraying the
> expenses of government or the undertakings authorized by it and, in fact,
> eventually will be returned to the NPM.  The NPM is nonetheless required to
> make the deposits into escrow as a condition of doing business in the states.

Opinion at 17-18.

Carolina argues that in order to meet the public purpose factor, (1) the pecuniary

obligation must be universally applicable to similarly situated entities; and (2) according priority

treatment to a government claim must not disadvantage private creditors with similar claims.  In

re Suburban Motor Freight, Inc., 36 F.3d 484, 488 (6th Cir. 1994). According to Carolina, the

description of the statute in the preamble states that the purpose is to make the tobacco product

manufacturers bear the cost of cigarette smoking.  The policy statement, according to Carolina,

demonstrates that the escrow deposits are for public purposes and are intended to defray the costs

of government.  The Escrow Deposit Statutes are universally applicable to all NPMs, and there

are no private creditors with similar claims.  In addition, Carolina argues that the escrow deposit

obligations are an excise tax since they are a "cut" from the sale of each cigarette sold by

Carolina.

The States respond that the bankruptcy court correctly determined that the claims were

not tax claims.  No payment is made to the government, and the government cannot use the funds

for whatever it desires.

Page 31 - OPINION AND ORDER

Contrary to Carolina's argument, before employing the two additional factors set forth <u>In re Suburban Motor Freight</u> test, the court must first determine whether it meets the <u>Lorber</u> test. That test requires that the money be used for public purposes, including the purposes of defraying expenses of government or undertakings authorized by it. The escrow deposits are not available to the States for any use. As I stated above, this is one of those "claims" that is "not in the nature of taxes." <u>In re George</u>, 361 F.3d 1157, 1163 (9th Cir. 2004).

D.    Whether Carolina Can Be Required to Make Escrow Deposits Monthly

Carolina appeals the bankruptcy court's order that the company set aside the escrow deposit amounts for post-confirmation sales on a monthly basis. No State requires monthly escrow deposits. Some states require quarterly deposits by NPMs that have had historical problems with deposits. Carolina argues that the bankruptcy court went beyond its powers in ordering this requirement. <u>See</u> <u>In re Peterson</u>, 42 B.R. 39, 42 (Bktrcy D. Or. 1984) (bankruptcy court should refuse to exercise equitable powers to create or increase substantive rights).

The court reviews the scope of the exercise of equitable power de novo, <u>Graves v. Myrvang (In re Myrvang)</u>, 232 F.3d 1116, 1124 (9th Cir. 2000), and the exercise of equitable power for an abuse of discretion, <u>id.</u> at 1121.

I find that the bankruptcy court has appropriately used its extensive equitable powers[7] to demand that the same amount of money Carolina would have to pay on a quarterly or annual basis is paid instead on a monthly basis. After all, "a bankruptcy court is a court of equity and

---

[7]"The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105(a).

Page 32 - OPINION AND ORDER

should invoke equitable principles and doctrines, refusing to do so only where their application would be 'inconsistent' with the Bankruptcy Code." <u>Beaty v. Selinger (In re Beaty)</u>, 306 F.3d 914, 922 (9th Cir. 2002) (citing <u>In re Myrvang</u>, 232 F.3d at 1124). The court desired to "provide additional assurance to the states that [Carolina] will not use funds necessary to satisfy the postpetition escrow deposit requirements as working capital or to pay prepetition claims." Opinion at 37. What the court ordered is not inconsistent with any provision of the Bankruptcy Code.

## CONCLUSION

Based on the foregoing, I AFFIRM the bankruptcy court's <u>Order Confirming Third Amended Plan of Reorganization Dated October 18, 2005 (As Modified February 24, 2006)</u> and DISMISS the appeal filed by the States and the cross-appeal filed by Carolina Tobacco Company.

IT IS SO ORDERED.

Dated this _____5th_____ day of January, 2007.


_____/s/ Garr M. King_____
Garr M. King
United States District Judge


Page 33 - OPINION AND ORDER